BREAUX, C. J.
Plaintiff avers personal injury suffered, and claims $10,000 of the defendants on that account. The jury and the judge below allowed damages in the sum of $1,000. Defendants appeal.
The defendants are the owners in indivisión of property on Union street, in this city, running through the block within which it is situated to Perdido street (i. e., the building and the lot run through the block from street to street). The width of the building is 72 feet. The two-story portion fronts on Union street, and the remainder back of the two-story portion runs back to Perdido street, and is a one-story building. The property faces both streets — Union and Per-dido.
The plaintiff’s employer, the Southern Express Company, was defendant’s-tenant. He *139 (plaintiff) avers, in 'substance, that on the 17th day of March, 1901, between 5 and 6 o’clock in the afternoon, the roof of the building on the lot just referred to fell in— also the brick wall on Perdido street — while he was employed in the building, inflicting sevei’e and painful injuries as it fell.
Plaintiff charges that the building was in a defective condition, owing to the defects of construction, and asserts that knowledge of this fact was brought home to defendants prior to the accident. Going into the details of the alleged defects, plaintiff alleges that the roof of the building was not supported by a sufficient number of joists and rafters to equally sustain the weight of the roof and the accumulation of water during rains; that it was a wide structure, and therefore required unusually strong support. The plaintiff also inveighs against the brick wall, and says that it was not thick enough to sustain the weight of the building, and particularly the inadequately supported roof; that the roof did not have a sufficient number of outlets for the water that would accumulate on the roof, especially where the roof sagged; and, generally, plaintiff sets up that the building was unsafe on a number of other grounds.
It may serve to clear a way to a decision and assist the discussion to state that there was no contributory negligence on the part of plaintiff at the time' of the accident. He was where he had the right to be. He was working for his employer, and had just driven his wagon into the rear building on Perdido street to unload the freight on his wagon. He stepped down from his wagon, and as he came to his horse’s head the roof caved in, part of the building suddenly collapsed, and he was caught in the débris and thrown out to the outside, in front of the building.
He was badly battered up, and taken to the hospital, where he remained from the 17th day of March until the 21st day of April. Erysipelas set in on the fourth day after he was there, and from its effects he lost his hair. He had a doctor while he was at the hospital. Since he left the hospital he has had no occasion to consult a physician. He was paid his salary ($50 a month) while he was at the hospital and until he returned to his work, which was some little time after he had left the hospital. His salary has since been increased by $5 a month.
On the day of the fall it rained very hard and hailed. It was an exceptionally heavy rain and hail storm.
Plaintiff’s witnesses testify that there had been a depression in the roof of the building facing Perdido street (that part which fell), and that this depression held water. “It was almost like a plate between the first of the skylights and Perdido street, and it contained water almost continually,” said one of plaintiff’s witnesses.
This witness is the proprietor of the three or four story hotel near the Denecheaud, and from one of his upper stories could see the roof of the building. He, the proprietor of this hotel, called the attention of the architect of defendants to this roof after a heavy rain, and suggested that it would perhaps cause an early decay in the roof, to which the architect readied that it was a tar roof, and that the water standing could not have the effect that the witness expressed as possible.
The testimony of this witness, Denecheaud, further, is that since the building was rebuilt, after the storm in question, there is no sag in the roof. It is level, and the water drains off.
A brother of this witness, younger in years, also testified, and substantially corroborated his brother’s testimony. He also had seen the water on the building of defendants, which covered a large space, relatively to the roof. He was standing near when the roof fell. He said that it fell from about halfway the distance between front and rear, and in the fall it bore on the front brick wall, and *140 caused it to fall in .the direction of the street. He also testified that there was a hailstorm just preceding and at the moment of the fall. He went to where the debris was immediately after the fall, and saw no evidence that the building had been struck by lightning.
The seventh witness on the list of plaintiff’s witnesses was a member of the fire department, and standing at the engine house, immediately in front of, and across the street from, the house that collapsed, as before mentioned.
He saw the falling building, and, in the main, corroborates the other witnesses of plaintiff regarding the fall; also the heaviness of the rain and the water that fell or was falling at the moment.
The foregoing was substantially the testimony for plaintiff on direct examination, as relates to the fall of the building, and some of the immediate incidents of the fall.
On the part of defendants it was shown that the downfall of the water was even greater than sworn to by plaintiff’s witnesses; also the downfall of the hail. The Weather Bureau record, produced at the instance of, and introduced in evidence by, defendants, shows that on the 17th day of March, 1904, from 6:05 p. m. to 6:22 p. m., the ground was covered with hail from one inch to three-quarters of an inch in depth, and that it was several inches deep in the corners. It is, we think, proper to add that the time of the beginning of the storm and its ending as laid down in the Weather Bureau record was the seventy-fifth meridianal time, which is just one hour faster' than local time. This brings the precipitation to about the time the witnesses testified that the accident happened.
The first peal of the thunderstorm heard by any Weather Bureau observer was heard about 6:05, seventy-fifth meridianal time, and the last peal long after dark. The storm came from the north.
The rainfall was 2.14 inches in 53 minutes. The hail fall shown on the Bureau’s record at this place was an average of about once a year in 13 years.
The architect and builder (Julius Koch) under whose direction the building occupied by the Southern Express was constructed was examined as a witness. He testified that the reconstruction originally was left to his judgment. No limit was placed upon his action. He was instructed to comply with the direction of the agent of the Southern Express Company, who was to be the tenant. He made the sketches according to what he understood this company wanted done. He submitted them to its agent, and they were accepted.
He swore that the beams were large and strong enough to carry what they are usually to carry. Average lumber was used, and the front on Perdido street was of pressed brick. The lumber was mostly 2x12.
His compensation was 10 i>er cent, commission on the cost of. the building. The expenditure was about $9,000, without taking the commission into account.
In the second reconstruction (that is, the reconstruction after the storm in question), he was asked by one interested in the adjacent wall not to put any strain on the party wall between his building and- the express company building, as he thought his wall would not be strong enough to carry it. In order to comply with this request, he put up iron columns and solid beams over it, "so that the rafters did not run in the same direction as they did before. The sheathing was put in the direction of Perdido street.
We may as well mention at this time that plaintiff’s contention is that the building was originally defective in construction, and that the reconstruction after the storm was for that reason changed.
*141 This witness (the architect) testified that the change was not made to avoid error of construction in the old building, but to comply with the request before stated.
The witness testifies further that at the request of the owner’s agent he put more openings in front of the new building than were in the old, so that in event of anything extraordinary happening to burden the roof with weight, such as a storm, there should be openings, though it was not customary to have so many.
He put in five or six more openings in front than there were in the building that collapsed. The additional openings will never be needed, for it is not “probable that anything of the kind will happen again in fifty years,” said the witness. He informed his employer that it was not necessary.
As to the pipes coming down from the roof to carry off! the water, they are not larger than those in the old building were, and only one new one was put in.
With reference to the “sag” in the roof, he says that it was pointed out to him; that it was only a shrinkage; that they put about one dozen bolts in each of the trusses; that afterward he watched it closely; that they could not straighten this sag, but it was checked; it did not weaken the building; that .it was a sag caused by the natural shrinkage of the lumber.
In fine, there was no difference between the building that collapsed and the new building. He, the witness, had made a calculation of the weight of the water the roof could, sustain, and fixed it at eight pounds to the square foot; that is, one solid foot of water, plus the weight of the roof. The weight of the roof itself was twenty pounds. The depth of the water on the roof in front was actually about two feet and six inches.
He examined the material of the structure after it was broken, and did not in any way find it defective. The foundation was more than sufficiently strong. The brick wall on the sides, front and rear, extended some feet above the roof. There were two outlets, one-at each end, of about 10 by 12 inches. They were even with the roof. This witness tes- ■ tilled that this was sufficient outlet. As an-expert, he also testified that the roof fell and was broken as it was from the effect of the weight of the water and the lightning-combined; that the roof was weighted down by water at the same time that it was struck, by lightning, although as to the effect of the-latter evidently the witness was not certain.
The architect; in all that the latter said regarding the contract to reconstruct the building about four or five years ago, and all that relates to executing the work of reconstruction, is' corroborated in every particular.
The following is an excerpt from the journal of the United States Weather Bureau:
“The greatest damage done by this storm was the collapse of the roof shed 'of the Southern Express Company, Perdido side. * * * It is claimed that the accident was due to an excessive accumulation of rain water on the shed, which is fiat, resulting from the clogging of the outlets and drainage pipes by hail and trash.”
We have met with a good deal of difficulty about this case, in more respects than one. The building was comparatively new. It had been reconstructed only about three years prior to the collapse.
It does seem that, if the lightning did strike the building sufficiently to cause the damage to the building, it would have left traces or marks. There is testimony uncontradicted that lightning usually fractures the substance it strikes — sometimes sets fire to it — or chars it. We are informed by the record that, if a building such as this was— supported by brick walls and wooden beams supporting the roof, with a tar cover over it, and shells — is struck by lightning, it would leave a mark at the point where it struck, and that it would certainly fracture some portion of the roof.
The dfibris or wreck, after the collapse was *142 complete, did not bear evidence of the zigzag course of the lightning striking off and , cutting down every object offering resistance.
The witness for plaintiff, an electrical engineer, referred to as a lightning expert, saw the ruins immediately after the collapse, and did not find any marks of lightning.
Mr. Pardue, agent of defendants’ tenant, testified that the lightning struck the Union shed end of the building, about 20 feet from Union street. That part of the building did not collapse. The inference is that it did strike the building, but lightly, as it did not leave any physical trace of its path, as it would have done if it had been a heavy stroke, demolishing and breaking everything in its way.
Granting all that is said in support of defendants’ theory in regard to the lightning, it then follows that the current struck the building near the front on Union street. It zigzagged on the roof, playing on its way with the slates on the front part of the roof until it struck a beam near the opposite end of the building on Perdido street, and split it in two. This was not enough, we imagine, to cause the front of the building on Perdido street to collapse. This beam was not the only support of the building. One beam was not the only prop of the roof where it fell.
We leave the lightning theory without being convinced that the casualty can be charged to nature’s electrical shock.
Another feature is earnestly pressed upon our attention by plaintiff. There was a swag in the roof, in which there was water at all times, or nearly always, witnesses for plaintiff testify.
The brick wall extended some feet above where it joined the roof. There were two outlets for the water — one at either end— measuring 10x12 inches. There were pipes that were conduits or drains for the water from the outlets. The record discloses that there were 2 feet 6 inches of water on the roof on the day and at the time of the collapse.
As strange as this may seem, it is the testimony of one of defendants’ witnesses — • an architect of experience, who affirmed his testimony in this respect by saying, in substance, that the water left its imprint where it stood.
Under any circumstance, water to that, depth should not be permitted to accumulate on any roof. No roof can stand that weight, unless built especially for the purpose. We will not dwell at any length upon the sub-' jeet. It c-annot be inferred that anything else than the water was the direct cause of the fall.
In passing upbn the weight of the water, wei found it impossible to arrive at any other conclusion than that which finds expression in our decree.
The lightning was not the first cause. It may be that the pool of water was struck by it. We have no reason to conclude that without this water the lightning would have caused an accident such as that which happened. The building, owing to the weight of the water which should not have been on it, was in imminent danger. The least touch .would have been enough to cause the accident, we infer. A witness for defendants (Mr. Koch) frankly states that the roof could have collapsed simply from the weight of the water on its top, and that the collapse was caused by the weight of the water and the lightning together.
If a person were to store powder in great quantity in a thickly settled place, and it were struck by lightning and caused injury, it would not be possible to charge it to lightning alone. Where the vis major strikes an exceedingly unsafe place, because of the weight thereon, or from any other cause, it (the vis major) is not the direct cause.
With reference to the hail, which is said *143 to have accumulated at the outlets, and some of it in the drain pipes from the roof, and thereby stopped the flow: The hail which fell on the day in question, even if it did stop the flow of water, could not have stopped it during other rains which must have contributed water to the large quantity which had accumulated prior to the collapse.
With the light before us, without further explanation in regard to the large pool of water, we must decline to disturb the verdict of the jury.
For reasons assigned, the judgment is affirmed.